Filed 1/31/14  P. v. Trayers CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061564 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD231116) |
| JENNIFER MICHELLE TRAYERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

After defendant Jennifer Michelle Trayers[1] suspected her husband, Frederick Trayers (Dr. Trayers), was having an extramarital affair and then confirmed her suspicion by reading his e-mail correspondence with his girlfriend, Jennifer killed him with a knife as they lay in bed by stabbing him numerous times. When the police forcibly entered the Trayers' home, they found Dr. Trayers dead on the bedroom floor on one side of the bed, and Jennifer, who was close to death with numerous lacerations later determined to be self-inflicted, on the floor on the other side of the bed near a military-style knife.

A jury convicted Jennifer of second degree murder (Pen. Code,[2] § 187, subd. (a)) and found true an allegation that she personally used a deadly and dangerous weapon (a knife) in committing the murder within the meaning of section 12022, subdivision (b)(1). The court sentenced her to an aggregate prison term of 16 years to life.

Jennifer appeals her conviction based on three contentions. First, she contends the court deprived her of her federal constitutional rights to due process and a fair trial by erroneously admitting evidence of her own extramarital affair, which she asserts was irrelevant and prejudicial character evidence the court should have excluded under Evidence Code sections 1101, 1102, and 352. Second, Jennifer contends the evidence is insufficient to support her conviction of second degree murder because no rational trier of fact could have found beyond a reasonable doubt that she killed her husband with malice

---

[1]    As Jennifer Trayers and her husband share the same last name, we shall refer to her as Jennifer. We intend no disrespect.

[2]    Undesignated statutory references will be to the Penal Code.

rather than in the heat of passion, and thus there is no substantial evidence she committed any crime greater than voluntary manslaughter. Last, she contends the prosecutor misstated the law and committed prosecutorial misconduct during her closing arguments by arguing that the degree of provocation required to reduce the unlawful killing of her husband to voluntary manslaughter was provocation that would cause a reasonable person to kill, thereby lowering the People's burden of proof in violation of her due process right to a fair trial. We affirm Jennifer's conviction of second degree murder. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

### A. *The People's Case*

Dr. Trayers was an emergency medicine physician at the Balboa Naval Medical Center in San Diego. When Jennifer killed him on December 4, 2010,[3] they had been married for 18 years.

### 1. *Stabbing death of Dr. Trayers*

After he attended a holiday party on the night of December 3, Dr. Trayers worked a night shift at the Balboa Naval Hospital until 6:00 o'clock the next morning. He was next scheduled to work at 11:00 a.m. on Sunday, December 5, and coworkers became worried when he did not come to work. They began attempting to reach him by phone on Sunday evening. Friends went to the Trayers' home, and, although both of the Trayers'

_____

[3] All further dates are to calendar year 2010 unless otherwise specified.

3

cars were there, they saw no sign of anything out of the ordinary other than that the Trayers were not at home. Coworkers called police late Sunday night.

Police officers went to the Trayers' home on Sunday night to conduct a welfare check, but observed that everything was quiet. Officers returned the next morning, December 6, and one of them looked through a window into a bedroom and saw a female (Jennifer) lying face up on the floor, with her clothing covered in blood, next to the left (or east) side of the bed (viewing the scene from the foot of the bed).

The officers forcibly entered the Trayers' home and found that Jennifer was barely alive with what were later determined to be self-inflicted knife wounds. A military-style knife with a blade about seven inches in length was found on the floor under the edge of the left (east) side of the bed very close to where Jennifer was found.[4]

Dr. Christina Stanley, a forensic pathologist who examined Jennifer in the hospital, testified that Jennifer had suffered about three dozen stab wounds or sharp force injuries primarily over a small area of her chest, many of which were superficial, and she had lost a significant amount of blood and was in shock. Her most significant injury was to an artery in the wall of her abdomen, but the wound did not go inside her abdomen.

Dr. Michael Sise, a vascular surgeon and trauma medical director at Scripps Mercy Hospital who treated Jennifer's multiple knife wounds, opined that the wounds

---

[4]     In her statement of the facts at page 7 of her appellant's opening brief, Jennifer incorrectly indicates the evidence shows the military-style knife was found near *Dr. Trayers's* body. Detective Michael Rabell of the San Diego Police Department testified that Dr. Trayers was found on the right side of the bed, and the military-style knife was found on the left side of the bed near where *Jennifer* was found.

4

were self-inflicted.  Dr. Sise explained that he found no wounds of self-defense, which are usually on the hands.  He also explained that the multiple wounds in the central area of Jennifer's chest were "hesitation marks," a term that trauma surgeons use to describe superficial wounds that may have penetrated the skin but had not penetrated deeply.

The police officers who entered the Trayers' home found Dr. Trayers dead and face down on the floor on the right (or west) side of the bed—opposite where Jennifer was found on the floor on the left side of the bed—in a fetal position facing the bed and leaning against the side of the bed with the bedding around his lower extremities.  The bedding around Dr. Trayers's body, as well as the pillows and the fitted sheet on the bed in the area near the headboard, were cut.  A kitchen or chef's knife was found near Dr. Trayers's left calf under the bedding.  He had a strand of hair—later determined to be Jennifer's—in his left hand.

According to a deputy medical examiner for the County of San Diego who examined Dr. Trayers's body at the scene of the killing, Dr. Trayers had suffered numerous stab wounds:  two in the chest, six in the back, one in the back of the head, one in the right forearm, one on the tip of the right index finger, one on the tip of the right middle finger, and another by the left thumb.  One of the chest wounds, which could have been a fatal wound, went through the heart and the right lung.  The multiple superficial incised wounds to Dr. Trayers hands were consistent with defensive wounds inflicted as he was attempting to block or grab the knife.

A large saturation of Dr. Trayers's blood was found on the pillows, sheets, and mattress on Dr. Trayers's right (west) side of the bed, and his blood spatter was on the

5

west side of the headboard, the wall, and the nightstand on his side of the bed. A blood spatter expert found the blood evidence was consistent with Dr. Trayers's having been stabbed while lying on the bed under the bedding, having flung a hand that was cut from the palm to the forearm, and having moved and ended up on the floor where the officers found him with the bedding (a comforter and sheet) around him.

The results of forensic toxicology testing indicated the presence of Zolpidem, a prescription sleep aid, in both Jennifer's system and that of Dr. Trayers. The amount in Dr. Trayers' system was within the normal therapeutic range for a single dose. Zolpidem is commonly used by emergency physicians as a sleep aid because they work different shifts and sometimes have trouble falling asleep. One empty bottle of Zolpidem, which had been prescribed for Dr. Trayers, was found on the left side of the bed within three or four feet of the military-style knife in the area where Jennifer was found, and another nearly empty bottle was found in a medicine box.

Three of four stacked manila envelopes found on a shelf near the Trayers' kitchen contained 218 pages of printouts of screen captures and numerous text messages to and from Dr. Trayers's phone, e-mails, and photographs of Dr. Trayers. Most of the documents were correspondence between Dr. Trayers and Danielle Robins (discussed, *post*) discussing how much they loved each other and their future plans together. There was also a lengthy e-mail from Jennifer to Robins.

2.  *Dr. Trayers' relationship with Danielle Robins and the events culminating in his death*

Robins testified that she met Dr. Trayers in August 2010 on a Mercy-class hospital ship when she was a medical student, and they developed a friendship. They both returned to San Diego County after their journey on the ship. Robins eventually started an emergency room rotation at Balboa Naval Medical Center where Dr. Trayers worked, and they began to have an affair at the end of September. They exchanged numerous e-mail and text messages in which they expressed their love for each other.

During this same time period, Dr. Trayers and Jennifer attended marriage counseling, and Dr. Trayers was conflicted about whether he should continue his affair with Robins. In late November or early December, he told Robins a false story that Jennifer was pregnant, and Robins told him they would have to end the affair. Unbeknownst to Dr. Trayers and Robins, Jennifer was reading their e-mail communications.

Early in the morning on December 4, Dr. Trayers texted Robins, who was in Maryland, that he had finished his shift and had about 30 minutes of dictation to complete. At around 7:15 a.m., Dr. Trayers, who was at home, sent his last text message to Robins telling her he was going to sleep. He took some Zolpidem to help him sleep.

About an hour later, Jennifer replaced her husband's photographs on Facebook with photos of themselves in happier times. Shortly thereafter, using her husband's e-mail account, Jennifer sent Robins two e-mails with attachments, one of which was a lengthy eight-page letter written by Jennifer and addressed to "Little Miss Grass is Not

Greener on My Side." In her letter, Jennifer accused Robins of having ruined her husband's marriage, career, and future. Jennifer wrote, "I was the last person he was with."

Within minutes of sending the e-mail to Robins, Jennifer deleted Dr. Trayers's Gmail account. On a shelf near the kitchen, Jennifer left manila envelopes containing copies of her e-mailed letter to Robins and e-mails between Dr. Trayers and Robins. It is undisputed that Jennifer killed Dr. Trayers that morning with a knife.

3. *Additional evidence*

Jennifer's mother, Deborah Smith, testified that she spoke with Jennifer by telephone on the morning of December 4 right after she texted Jennifer at around 9:00 a.m. Jennifer told her she and Fred (Dr. Trayers) were sleeping in.

a. *Evidence of Jennifer's extramarital affair*

Orvill Webb testified he met Jennifer in Florida in 2001 or 2002, and they a sexual affair that began around 2002 and ended in late 2004 or 2005.

B. *Defense Case*

Jennifer testified on her own behalf. She and Dr. Trayers, who was in the Navy training to be a pilot, met in 1991 and married in 1992. In 1997, they moved to Fallon, Nevada, so Dr. Trayers could teach at the Top Gun flight school. In Fallon, Dr. Trayers met Danielle Merket, a civilian who was conducting some sort of psychological research on pilots. The two continued to have contact after Merket left Fallon.

Jennifer testified that she and her husband moved to Fort Lauderdale in 2001, and her husband started medical school. Dr. Trayers contacted Merket, who lived in Orlando,

8

and they started spending time together.  Jennifer eventually became convinced they were having an affair.

Jennifer began to have a sexual relationship with Webb in early 2003 because she was upset her husband was in love with Merket and felt their marriage was over.  Dr. Trayers learned about the relationship a couple months after it started and blamed himself for not paying attention to Jennifer and not being home.  The couple stayed together, but the marriage was under strain.

Jennifer testified that when they moved from Florida to San Diego in 2005, they agreed to put the affairs behind them and renewed their vows in 2007 on their 15th anniversary.  Jennifer became angry when she caught Fred e-mailing Merket late in 2007, but she remained in the marriage.  She testified that her relationship with Dr. Trayers from early 2010 to early August of that year was good, there was never a time when she used physical violence against him, and he did not use physical violence against her.

Jennifer testified that when Dr. Trayers returned from the Mercy ship cruise in early September, she became suspicious over the amount of time he spent sending text messages to someone else on his phone.  She became anxious because she felt something was wrong and started losing weight and not sleeping.  The couple began going to counseling in late September, but Dr. Trayers continued to deny anything was happening.

Jennifer stated she installed spyware software on their home computer and Dr. Trayers's laptop in early October that allowed her to see what he was communicating by e-mail.  The first e-mail she read was from Dr. Trayers to another woman about what he had done with her that day.  She mistakenly thought Dr. Trayers was communicating with

Danielle Merket. Jennifer testified she felt sick when she read that e-mail, and she began to print the e-mails. She confronted Dr. Trayers in mid-October about the hundreds of text messages the phone bill showed he had sent to a phone number in Maryland, and he told her he was simply helping a medical student (Danielle Robins) in Maryland.

Jennifer testified she read one e-mail from Danielle Robins that called Dr. Trayers "Mr. Wonderful" and suggested he was with Robins exclusively. Jennifer started feeling better when she deduced from the e-mails that Dr. Trayers's relationship with Robins was ending, but then in late November she saw one informing Dr. Trayers that Robins was returning to Camp Pendleton. Jennifer testified she continued feeling anxious and losing weight. In late November, Dr. Trayers removed photos of the two of them from his Facebook page.

The eight-page e-mail that Jennifer sent to Robins was actually a journal Jennifer began in October. She testified she made her last entry on December 1. She made no entry on the morning of December 4. She stated that when she wrote her entries—such as, "I will have the joy of knowing I got to spend quality time with him," and "I got to see him every day," which she acknowledged seemed to be in the past tense—she had no plan to kill her husband, but was considering suicide. By the end of November, she was sleeping only one or two hours a night.

Jennifer also testified that on December 3, before Dr. Trayers left for the holiday party and then work, he sat down on the couch with her and told her he would never leave her and that he wanted to start being honest with her and communicating more. Jennifer wanted him to admit his affair with Robins, but did not confront him about it

10

because she had not told him she was reading his e-mail. She did not sleep at all that night; she was awake worrying about their relationship.

Dr. Trayers came home from work at around 7:30 a.m. (Dec. 4), and talked about the Christmas party the night before. He said there would be pictures from it on Facebook. Jennifer said to him, "Speaking of Facebook," and asked what had happened to the missing photos of the two of them on his Facebook page. Jennifer testified he claimed he did not know what she was talking about, and she became angry that he was "playing dumb." They went to the computer and Dr. Trayers pretended he did not know how the pictures had disappeared. He posted some pictures of the two of them, and said, "Now are you happy?" in a voice that sounded like he was disgusted with her.

Jennifer testified that, while Dr. Trayers was in the bathroom, she stayed at the computer and found 12 to 15 new e-mails that she believed were from Robins and deleted all of them without reading them. She then sent an e-mail to Robbins from Dr. Trayers's account with photos attached showing him wearing his wedding ring. She also sent screen prints of pornography and herpes Web sites Dr. Trayers had visited. Finally, in a second e-mail, Jennifer pasted the journal she had been keeping and sent it as the eight-page e-mail to Robins using Dr. Trayers's account.

According to Jennifer, when Dr. Trayers came out of the bathroom she repeatedly asked him to talk to her about what he had said the night before, about being honest and communicating more. Dr. Trayers told her to calm down, said they should first take a nap, and told her they should both take Ambien and get some sleep. During this time, Dr.

11

Trayers received a phone call he said was from a Virginia area code, and Jennifer assumed it was Robins. Dr. Trayers let the call go to voice mail.

Jennifer testified that Dr. Trayers crushed more than one Ambien pill, put them in orange juice, and they each drank half. She did not know how many Ambien pills he put in the juice. She became increasingly anxious and angry, and Dr. Trayers kept saying he wanted to take a nap before talking. Jennifer retrieved the manila envelopes in which she had been keeping the e-mails and other documents and showed them to Dr. Trayers, who shook his head and said that he did not want to see them, he was going to bed to read, and they could talk after lunch.

Jennifer testified she became more angry, went to the kitchen, slammed down the envelopes, and grabbed a butcher knife. She thought if she threatened to hurt herself she would get him to talk to her. She took the knife into the bedroom where Dr. Trayers was lying on the right side (as viewed from the foot of the bed), got into the middle of the bed by his right arm, held the blade of the knife to her wrist, and asked him whether that was the way to cut her wrists. She had no intention to kill or hurt Dr. Trayers, but assumed he would stop her if she tried to hurt herself. He started laughing at her. Dr. Trayers told her the butcher knife was not sharp enough, and then reached down and opened the bottom drawer of the nightstand to show her his military knife. Jennifer testified she jumped over him and grabbed it, put the butcher knife on the nightstand, and returned to the middle of the bed. Jennifer put the military knife against her left wrist and again asked him how to hold the knife to cut her wrist. Dr. Trayers told her that, if she wanted

12

to kill herself, she needed to cut an artery that ran down her arm, and she started poking at that artery with the knife.

According to Jennifer's testimony, Fred did not respond, and she grew angrier. She poked herself harder and started to bleed and from Dr. Trayers' reaction she believed he thought it was funny. Jennifer held the knife to her chest and asked where she should stab herself, and he said, "Lower." Jennifer testified she became angrier than she had ever been.

Jennifer, while still being questioned by her counsel on direct examination, testified that Dr. Trayers, using his left hand, grabbed her wrist to try to take the knife from her. She also stated that Dr. Trayers was right-handed, and he used his left hand because she was kneeling on his right hand. Jennifer testified she did not intentionally kneel on his right hand to pin it down.

Jennifer's counsel asked her, "And at this point right as he starts to grab toward the knife, do you recall whether you were feeling the effects of the Ambien or not?" Jennifer replied, "I don't recall that I am."

Jennifer indicated she and Dr. Trayers started wrestling when she was still on top of his right hand, but he got his right hand out from under her, and then they struggled over the knife. During the struggle, the knife remained pointed in Jennifer's direction even though her arms were swinging. To force Dr. Trayers to release his grip on her right wrist, Jennifer leaned over him and banged his left arm on the side of the mattress. She testified that, even through Dr. Trayers was stronger, she was able to free her wrist from his grip. Dr. Trayers then sat up and reached with his right hand for the butcher

13

knife on his nightstand. Jennifer testified that Dr. Trayers touched the handle of the knife, and she stabbed him with the military knife in the back of the neck because "[i]t was the first place I saw skin" and she aimed for it. The butcher knife fell to the floor.

Dr. Trayers then stood up by the nightstand, facing her and pulling the comforter and flat sheet from underneath her. Jennifer testified that Dr. Trayers bent down and then she blacked out. She stated she did not remember stabbing Dr. Trayers a second time, and she had no memory of stabbing him multiple times in the chest and back. Jennifer also testified she did not specifically intend to kill her husband that morning, and she never thought that morning that she was so jealous of his seeing Robins that she wanted him dead.

## DISCUSSION

### I. *ADMISSION OF EVIDENCE OF JENNIFER'S EXTRAMARITAL AFFAIR*

Jennifer first contends her second degree murder conviction must be reversed because the court deprived her of her federal constitutional rights to due process and a fair trial by erroneously admitting evidence of her marital affair with Webb, which she asserts was irrelevant and prejudicial character evidence that the court should have excluded under Evidence Code sections 1101, 1102, and 352. This contention is unavailing.

#### A. *Background*

##### 1. *Jennifer's in limine motion to exclude evidence of her extramarital affair*

Jennifer filed a motion in limine seeking to exclude evidence that she had an extramarital affair with Webb that ended around 2005. Jennifer argued that evidence of

14

Dr. Trayers's first affair with Danielle Merket in 2007 should be admitted as it was relevant to her state of mind at the time she killed him "because there is a strong inference that the culmination of [Dr. Trayers's] marital indiscretions provided sufficient provocation for [her] to engage in the killing of her late husband." However, she claimed that evidence of her own affair with Webb should be excluded under Evidence Code section 352 (discussed, *post*) because it was irrelevant and its admission would create substantial danger of undue prejudice.

The prosecutor did not object to admission of evidence of Dr. Trayers's first affair, but argued that evidence of Jennifer's own "lengthy" affair with Webb should be admitted to show the true state of their marriage. Specifically, the prosecutor argued that in the eight-page letter Jennifer e-mailed to Robins, Jennifer portrayed herself as a wife who had been dedicated to her husband during their 19-year marriage despite his two affairs, and who had been faithful to him and had supported him at every step. The prosecutor also argued the letter should be admitted in its entirety because it showed Jennifer's "thought processes, her deliberation, her consideration," and "her manipulation of the truth." The prosecutor further argued the evidence of Jennifer's affair should be admitted during the People's case-in-chief because the admission into evidence of the eight-page letter "paint[ed] a picture" of a dedicated wife who had sacrificed for her husband, and based on the admission of that evidence Jennifer chose not to testify. The evidence of Jennifer's extramarital affair would show "the truth of this marriage," that "[i]t was not a committed relationship," and there was "a history . . . of rupture in this marriage."

15

a. *First ruling*

The court ruled that evidence of Jennifer's extramarital affair was admissible and should be presented during the prosecution's case-in-chief. The court explained that "trials are about a search for the truth and evaluating both sides, and to paint a picture of . . . the wife who has done everything for the husband and sacrificed everything for him . . . would paint a very misleading picture if the jury were not to be made aware of this problem in her marriage where she had this long-term affair." The court indicated that this evidence should not be kept from the jury—especially when the defense was arguing that evidence of an affair Dr. Trayers had, even before Jennifer had her own affair, was relevant—because the jury had to evaluate what was going on in Jennifer's mind when she killed Dr. Trayers and how his relationship with Robins affected her. The court found the evidence of Jennifer's affair was relevant in "impeaching her honesty in the emails" and "impeaching the motivation which she expresses in this lengthy email that she sen[t]" to Robins. However, the court ruled the prosecution could only call as a witness the person (Webb) with whom she had the affair, and he could only testify briefly that he had the affair and the dates of the affair.

2. *Jennifer's renewed objections to the evidence of her extramarital affair*

Defense counsel renewed his objections before Webb testified during the prosecution's case-in-chief. Jennifer's attorney asserted that Webb's testimony was not relevant and requested that Webb "not be allowed to testify under [Evidence Code] section] 352." Counsel stated that Jennifer would not deny her affair with Webb if asked about it.

16

In response, the prosecutor argued Webb's testimony was still needed because defense counsel's opening statement indicated that Jennifer would testify her affair with Webb was brief and not continuous, and Webb's testimony would be different. Noting that Webb was an out-of-state witness whose availability was limited under the terms of the interstate compact, the prosecutor expressed concern the People would be unable to present Webb's testimony if they had to wait until their rebuttal case. Both the prosecutor and defense counsel acknowledged that Jennifer's testimony was expected to be lengthy.

a. *Second ruling*

The court reaffirmed its earlier ruling that the prosecution would be allowed during its case-in-chief to present Webb's testimony about his affair with Jennifer. The court explained that Webb's testimony "[would] be relatively brief" about an affair that "[Jennifer] really doesn't dispute," and "the [Evidence Code section] 352 aspects of it are very limited." The court stated it was "inclined to allow [Webb] to testify" given that both defense counsel and the prosecutor acknowledged Jennifer would be on the witness stand for more than a day, and "we'd lose the ability to have him testify" unless he testified during the prosecution's case-in-chief. The court also observed that the "chances" Jennifer's testimony and Webb's testimony would be identical regarding their affair were "rather remote," and, thus, Webb's testimony "would be coming in legitimately in rebuttal in any event." The court reiterated that the jury needed to hear as much information as possible about what happened during the last 10 years of Jennifer and Dr. Trayers's marriage "in order to understand what the emotions were and what [Jennifer] was feeling on . . . December 4" when she killed Dr. Trayers.

17

Shortly thereafter, the prosecution presented Webb's brief testimony (discussed, *ante*) regarding his sexual affair with Jennifer, which, he stated began around 2002 and ended in late 2004 or 2005.

B. *Applicable Legal Principles*

Evidence Code section 350 provides that only relevant evidence is admissible. Evidence Code section 210 defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." "[A] trial court has broad discretion in determining the relevance of evidence." (*People v. Smithey* (1999) 20 Cal.4th 936, 973.)

1. *Evidence Code section 1101*

Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Thus, evidence of other crimes or bad acts is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a).)

Evidence Code section 1101, subdivision (b) "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, *supra*, 7 Cal.4th at p. 393, fn. omitted.) Specifically, that subdivision provides that nothing in Evidence Code section 1101 "prohibits the admission of evidence that a person

18

committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

    2. *Evidence Code section 352*

    If the trial court determines that uncharged misconduct is admissible under Evidence Code section 1101, subdivision (b), it must then determine whether the probative value of the evidence is " 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 404; Evid. Code, § 352.)

    The California Supreme Court has explained that "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which *uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues*. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

19

### 3. *Standard of review*

We review the trial court's rulings under Evidence Code sections 1101 and 352 for an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) We will not disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

### C. *Analysis*

The court did not abuse its discretion in admitting Webb's testimony about his extramarital affair with Jennifer. Jennifer asserts that Evidence Code section 1101 "codified the rule that protects a defendant from being judged guilty of present charges because of . . . her prior acts." (See Evid. Code, § 1101, subd. (a); *Ewoldt*, *supra*, 7 Cal.4th at p. 393.) However, as already discussed, this rule does not prohibit admission of evidence of uncharged prior conduct when such evidence is relevant to establish some fact other than the defendant's character or criminal disposition to commit the charged offenses. (Evid. Code, § 1101, subd. (b); *Ewoldt*, at p. 393.)

Jennifer claims the court erred in admitting Webb's testimony because, although her intent or motive was at issue, this evidence "shed no light on what [her] mental state was" when she killed Dr. Trayers. This claim is unavailing. "Evidence of an accused spouse's intimate relations with others is relevant to the state of . . . her marital relationship with the victim spouse and, therefore, to motive." (*People v. Houston* (2005) 130 Cal.App.4th 279, 307; see also *People v. Gosden* (1936) 6 Cal.2d 14, 25 [noting that "'[n]o rule is more firmly established than that, upon the trial for murder of husband or

20

wife, evidence tending to show illicit relations of the accused with another is admissible to show lack of love or affection for the defendant's lawful spouse.'"].)

Here, Jennifer placed at issue the state of her marriage with Dr. Trayers, and thus her motive in killing him, by arguing that evidence of Dr. Trayers's first affair—with Merket before she had her own affair with Webb—was relevant to her state of mind at the time she killed Dr. Trayers. Webb's testimony about his affair with Jennifer while she was married to Dr. Trayers was relevant to both the state of her marital relationship with Dr. Trayers and her motive at the time she killed him. (See *People v. Houston*, *supra*, 130 Cal.App.4th at p. 307; *People v. Gosden*, *supra*, 6 Cal.2d at p. 25.)

Jennifer also asserts "[t]here was nothing to link Webb's testimony to what happened to [Dr. Trayers]" because "[i]t . . . said nothing about [her] credibility." This assertion is also unavailing. Evidence Code section 1101 does not prohibit admission of evidence of uncharged prior conduct to attack a defendant's credibility. Subdivision (c) of that section expressly provides: "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." (See also *People v. Clark* (2011) 52 Cal.4th 856, 934-935 ["Evidence that defendant had sexual contact with women other than [the woman to whom he considered himself married] during their relationship had some tendency in reason to . . . call his credibility into question."].)

Here, Jennifer portrayed herself in the eight-page e-mail she sent to Robins as a wife who had been dedicated to Dr. Trayers over the years and had sacrificed for him despite his two extramarital affairs. Webb's testimony that Jennifer had her own affair

21

with him undermined her self-portrayal in that letter and "had some tendency in reason to . . . call [her] credibility into question." (*People v. Clark*, *supra*, 52 Cal.4th at p. 935.)

In a related a claim, Jennifer asserts the Attorney General "offers no authority for presenting 'impeachment' evidence to attack the credibility of evidence [(Jennifer's statements in her e-mailed letter)] presented by the prosecution." However, the reporter's transcript of the hearing on Jennifer's motion to exclude Webb's testimony shows the court agreed with the prosecutor's arguments that Webb's testimony should be presented during the People's case-in-chief because (1) defense counsel's opening statement indicated Jennifer would testify that her affair with Webb was brief and not continuous, and Webb's testimony would be different; (2) Webb was an out-of-state witness whose availability was limited; (3) Jennifer's testimony was expected to be lengthy;  and (4) the prosecution would be unable to present Webb's testimony if it had to wait until its rebuttal case. The court found the chances Jennifer's testimony and Webb's testimony would be identical regarding their affair were rather remote, and, thus, Webb's testimony "would be coming in legitimately in rebuttal in any event." We conclude the court did not abuse its discretion in allowing the prosecution to present Webb's brief testimony during the People's case-in-chief because the record shows he was an out-of-state witness who would have been unavailable to testify as a rebuttal witness following Jennifer's lengthy testimony.

Jennifer also contends the court should have excluded Webb's testimony under Evidence Code section 352 because, "[i]f there was any minimal relevance[,] it was outweighed by its prejudicial effect." We reject this contention. Under Evidence Code

section 352, evidence is properly excluded if its probative value is "substantially outweighed" by the probability that its admission will necessitate undue consumption of time, or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

Here, the reporter's transcript of Webb's brief trial testimony consists of only 10 pages. Webb indicated he met Jennifer, who was then married to Dr. Trayers, in 2001 or 2002 when he and the Trayers lived in Florida. He testified that he and Jennifer worked together, and they eventually had an affair that began around 2002 and became a sexual affair. Webb stated the affair ended in late 2004 or 2005. Webb's testimony was not unduly prejudicial for purposes of Evidence Code section 352 as it did not amount to evidence that "'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis*, *supra*, 46 Cal.3d at p. 638.)

Last, we reject Jennifer's contention that "[t]he erroneous introduction of unnecessary and inflammatory evidence of an old extramarital affair that contained little or no probative value rendered [her] trial fundamentally unfair, in violation of the Fourteenth Amendment right to due process." For reasons already discussed, we conclude the court did not err.

## II.  *SUFFICIENCY OF THE EVIDENCE*

Jennifer also contends the evidence is insufficient to support her conviction of second degree murder because no rational trier of fact could have found beyond a reasonable doubt that she killed her husband with malice rather than in the heat of

passion; and, thus, there is no substantial evidence she committed any crime greater than voluntary manslaughter.  We reject this contention.

A.  *Applicable Legal Principles*

1.  *Second degree murder and the heat of passion form of voluntary manslaughter*

"Criminal homicide is divided into two types:  murder and manslaughter." (*People v. Beltran* (2013) 56 Cal.4th 935, 941 (*Beltran*).)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."  (§ 187, subd. (a).)  Section 188 defines malice aforethought, which may be either express or implied.  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*).) "Express malice is an intent to kill.  [Citation.]  . . .  Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses."  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

First degree murder is an unlawful killing with malice aforethought, willfulness, premeditation, and deliberation.  (*Chun*, *supra*, 45 Cal.4th at p. 1181; see also § 189.) "'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder.'"  (*Chun*, at p. 1181.)

"Manslaughter is the unlawful killing of a human being without malice."  (§ 192.) A manslaughter offense is *voluntary* when the killing is "upon a sudden quarrel or heat of passion."  (§ 192, subd. (a).)

24

"Voluntary manslaughter is a lesser included offense of murder." (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) Thus, voluntary manslaughter is a lesser included offense of second degree murder, of which Jennifer was convicted in this case.

"The heat of passion requirement for [voluntary] manslaughter has both an objective and a subjective component." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The subjective component requires proof that the defendant "actually, subjectively, kill[ed] under the heat of passion." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) The objective or "reasonable person" component of the heat of passion form of voluntary manslaughter requires proof of physical or verbal conduct by the victim that, under the circumstances at the time of the killing, was "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee* (1999) 20 Cal.4th 47, 59; see also *Beltran*, *supra*, 56 Cal.4th at p. 942.) Stated differently, the victim's provocative conduct "must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*Lee*, at p. 60.)

"'[I]f sufficient time has ela[ps]ed for the passions of an ordinarily reasonable person to cool, a killing is murder, not [voluntary] manslaughter.'" (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

2. *Standard of review*

When assessing a challenge to the sufficiency of the evidence, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial

25

evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

The uncorroborated testimony of a single witness is sufficient to sustain a conviction or true finding on an enhancement allegation, "unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

B. *Analysis*

Viewing the evidence in the light most favorable to the judgment, as we must (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578; *Jackson v. Virginia*, *supra*, 443 U.S. at p. 319), we conclude any reasonable trier of fact could find beyond a reasonable doubt that Jennifer acted with malice when she fatally stabbed Dr. Trayers, and that Dr. Trayers's conduct was not "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Lee*, *supra*, 20 Cal.4th at p. 59.)

1. *Malice*

Substantial evidence shows Jennifer acted with malice by either intentionally killing Dr. Trayers or by acting with a conscious disregard for his life while knowing she was endangering his life. (See *Chun*, *supra*, 45 Cal.4th at p. 1181.) Jennifer's own testimony establishes that the first stabbing wound she inflicted was to the back of Dr. Trayers's neck and that she intentionally aimed at that part of his body. Specifically, Jennifer testified she stabbed him "the first time" with the military knife "in the back of the neck." Her trial counsel then asked her, "Did you aim for the back of his neck or head, or did that just happen that way?" Jennifer replied, "It was the first place I saw skin." Her counsel then asked her, "And when you say that was the first place you saw skin, were you *aiming* for a part of his body that had skin showing?" (Italics added.) Jennifer answered, "Yes."

In addition, undisputed medical expert testimony established that Jennifer stabbed Dr. Trayers numerous times in vital parts of his body, including twice in the chest and eight times in the back. One of the chest wounds, which was two and a half inches deep, went through the heart and the right lung. The other chest wound, which was three and a half inches deep, went through the left lung. One of wounds in the back went into the chest cavity, another entered the abdomen and cut into the right kidney, and another went through the left kidney.

Any rational trier of fact could find beyond a reasonable doubt that, because Jennifer specifically and intentionally "aimed" her first strike with the knife at the back of Dr. Trayers's neck, she also intentionally aimed the subsequent knife strikes to the chest

27

and back in such a way that they would cut through vital organs. (See *People v. Bolden* (2002) 29 Cal.4th 515, 561 ["In plunging the knife so deeply into such a vital area of the body of an apparently unsuspecting and defenseless victim, defendant could have had no other intent than to kill."].) Jennifer did claim in her testimony that she suddenly "black[ed] out" after she stabbed Dr. Trayers in the neck and that she had no memory "whatsoever" of stabbing him multiple times in the chest and back. She also indicated that she and Dr. Trayers had taken an equal dose of Ambien, which is a sleep medication, before she attacked him with the knife.[5]

However, Jennifer's own testimony shows she was not feeling any effects from the Ambien during the struggle for the military knife she was holding immediately before she stabbed Dr. Trayers in the neck. Specifically, after Jennifer testified about that struggle, her counsel asked her, "And at this point . . . do you recall whether you were feeling the effects of the Ambien or not?" Jennifer replied, "I don't recall that I am." In her testimony, Jennifer indicated she blacked out almost immediately after she stabbed Dr. Trayers in the neck. However, in finding Jennifer killed Dr. Trayers with malice aforethought and she was guilty of second degree murder, the jury found her testimony was not credible. The foregoing substantial evidence supports the jury's findings, and we will not reevaluate Jennifer's credibility as a witness. (See *People v. Ochoa*, *supra*, 6

---

[5]  Jennifer testified that Dr. Trayers crushed more than one Ambien pill, put the medication in orange juice, and they each drank half. Expert testimony established that the amount of this drug later found in Dr. Trayers' system was within the normal therapeutic range for a single dose. The foregoing substantial evidence supports a finding that, like Dr. Trayers, Jennifer only took a single dose.

28

Cal.4th at p. 1206 ["'[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.'"].)

The prosecution presented additional substantial evidence that supports the jury's findings that Jennifer killed Dr. Trayers with malice and her testimony was not credible. Expert witness testimony established that the multiple incised wounds to Dr. Trayers's hands were consistent with defensive wounds that were inflicted as he was attempting to block or grab the knife to defend himself, Jennifer's knife wounds, most of which were superficial, were self-inflicted, and she had no wounds of self-defense.

Also, as discussed in greater detail in the factual background, *ante*, substantial evidence showed that a large saturation of Dr. Trayers's blood was found on the pillows, sheets, and mattress on his side of the bed; the pillows, as well as the sheets that had been over and under Dr. Trayers, were slashed; and a blood spatter expert found the blood evidence was consistent with Dr. Trayers's having been stabbed while he was lying on the bed under the bedding. From this evidence any rational trier of fact could find beyond a reasonable doubt that Jennifer stabbed Dr. Trayers while he was in bed trying to sleep and that she was not credible when she testified that he stepped out of bed and pulled the flat sheet and comforter off the bed before she inflicted the fatal stab wounds.

That Jennifer acted with malice is also circumstantially shown by the eight-page letter she e-mailed to Robins on the morning of the killing, in which she wrote, "I was the last person he was with." A rational jury could infer from this statement referring to Dr. Trayers in the past tense that Jennifer harbored the intent to kill him.

29

For all of the foregoing reasons, we reject Jennifer's contention that no rational trier of fact could have found beyond a reasonable doubt that she killed her husband with malice.

2. *Heat of passion*

We also reject Jennifer's contention that there is no substantial evidence she committed any crime greater than voluntary manslaughter because "[n]o reasonable juror could conclude that the situation was not one in which an ordinary person could be provoked to act rashly, from passion rather than judgment."

As already discussed, voluntary manslaughter is a lesser included offense of second degree murder. (See *People v. Cole*, *supra*, 33 Cal.4th at p. 1215.) We begin our analysis by noting that "'[i]n deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury.'" (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 585, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 162.) Thus, we will not disturb the jury's implied determination that Jennifer was not a credible witness.

We conclude the evidence of provocation is insufficient to satisfy the objective or "reasonable person" component of the heat of passion form of voluntary manslaughter, which requires proof that Jennifer's heat of passion resulted from conduct on the part of Dr. Trayers that, under the circumstances at the time Jennifer killed him, was "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee*, *supra*, 20 Cal.4th at p. 59.) Jennifer did not learn about Dr. Trayers's extramarital affair with Robins on or

30

shortly before the day of the stabbing. Substantial evidence shows she learned about the affair in October, almost two months before she killed him in early December. Specifically, Jennifer testified that she installed spyware software on their home computer and Dr. Trayers's laptop in early October that allowed her to read what he was communicating by e-mail. She indicated she read one e-mail from Robins in mid-October that referred to Dr. Trayers as "Mr. Wonderful," which Jennifer interpreted to mean he was with Robins exclusively.

The evidence also shows that in late November or early December, Dr. Trayers told Robins a false story that Jennifer was pregnant, and Robins told him they would have to end the affair. In her testimony, Jennifer acknowledged that she deduced from the e-mails she was surreptitiously reading that Dr. Trayers's relationship with Robins was ending and Dr. Trayers had told Robins they could not see each other anymore. The foregoing evidence supports a reasonable inference that Dr. Trayers had falsely told Robins that Jennifer was pregnant as an excuse to end his relationship with Robins and stay with Jennifer.

In her testimony, Jennifer claimed that Dr. Trayers laughed at her when she put the blade of the butcher knife against her wrist and that she believed from Dr. Trayers's reaction after she subsequently started poking her wrist harder with the military knife that he thought her behavior was funny. Even if we were to assume the jury found this testimony credible, Dr. Trayers's responses to Jennifer's escalatingly provocative behavior were not sufficiently provocative that they would cause an ordinary, sober person of average disposition under the circumstances to become "so inflamed

31

that . . . she would lose reason and judgment" (*People v. Lee, supra,* 20 Cal.4th at p. 60) and "act rashly or without due deliberation and reflection" (*id.* at p. 59).

### III.  *PROSECUTORIAL MISCONDUCT*

Last, Jennifer contends the prosecutor misstated the law, and thereby committed prosecutorial misconduct, during her closing arguments by arguing that the degree of provocation required to reduce the unlawful killing of her husband from murder to voluntary manslaughter was provocation that would cause a reasonable person to kill, thereby lowering the People's burden of proof in violation of her due process right to a fair trial.  This contention is unavailing.

A.  *Applicable Legal Principles* (*Prosecutorial Misconduct*)

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

When a claim of prosecutorial misconduct focuses on the prosecutor's questions or comments before the jury, " 'the question is whether there is a *reasonable likelihood* that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1202-1203, italics added, quoting *People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 822-823.)

32

"[I]t is misconduct [for a prosecutor] to misstate the law during argument."
(*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21, citing *People v. Boyette* (2002) 29 Cal.4th 381, 435.)

B. *Background*

The court instructed the jury on voluntary manslaughter based on heat of passion by giving CALCRIM No. 570. The court's instruction stated in relevant part:

> "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, *would have reacted from passion rather than from judgment*." (CALCRIM No. 570, italics added.)

During her closing argument, the prosecutor discussed the heat of passion form of voluntary manslaughter and what constituted sufficient provocation. She then made the following statements that Jennifer now claims, for the first time, misstated the law regarding provocation:

> "You decide whether the provocation was sufficient.
>
> "What does [Jennifer] tell you about it?
>
> "You decide whether a person of average disposition in the same situation, knowing the same facts, knowing the same circumstances, would that person, that average person, have *reacted in the same manner* from passion, rather than judgment[.] [¶] . . .
>
> "Well, *would a person of average disposition kill* if under those circumstances this husband, who had been an ideal husband as described in this letter . . . . [¶] . . .
>
> "If that were to occur where a person were to say 'Don't do it like this. Cut it that way," laugh, get up. Get up off that bed. Get out of that room. Get out of that condo and leave that marriage. Walk out. Go.

"But stab a man in the head, in the chest, in the back nine times for that? Is that sufficient provocation? *Is that sufficient reason to kill?*" (Italics added.)

Shortly thereafter, the prosecutor argued, "Again, the defendant cannot set her own standard. It has to be how a person of average disposition *would react*." (Italics added.)

C. *Analysis*

Jennifer contends the prosecutor's foregoing argument misstated the law regarding provocation, and thereby constituted misconduct, because the prosecutor "encouraged jurors to consider whether the provocation would cause an average person to do what [(Jennifer)] did—kill the victim."

1. *Forfeiture*

At the threshold, the Attorney General argues Jennifer forfeited appellate review of her claim of prosecutorial misconduct by failing to object in the trial court to the statements he now contends constituted misconduct and by failing to request an appropriate curative admonishment. We agree.

A defendant may not complain of prosecutorial misconduct on appeal unless he or she objected at trial on that ground, in a timely fashion, "'and also requested that the jury be admonished to disregard the perceived impropriety.'" (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) The California Supreme Court has explained that "[t]he primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice. [Citation.] Obviously, that

34

purpose can be served only if defendant is required to, and does, raise any objection before the jury retires." (*People v. Williams, supra,* 16 Cal.4th at p. 254.)

Here, Jennifer concedes that "[d]efense counsel did not object to the prosecutor's argument," and she impliedly acknowledges that she thereby forfeited her prosecutorial misconduct claim, suggesting that her trial counsel was constitutionally ineffective for failing to preserve the claim for appellate review. However, she asks this court in its discretion to reach the merits of her claim.

An appellate court has discretion to adjudicate an important question of constitutional law despite a party's forfeiture of the right to appellate review. (*People v. Johnson* (2004) 119 Cal.App.4th 976, 985; *People v. Marchand* (2002) 98 Cal.App.4th 1056, 1061.) In the exercise of discretion, we now reach the merits of Jennifer's claim of prosecutorial misconduct.

2. *Merits*

Jennifer asserts that the prosecutor misstated the law, and thereby committed misconduct, by telling the jurors that, in deciding whether the provocation in this case was sufficient to reduce the unlawful killing of Dr. Trayers from murder to voluntary manslaughter, they had to decide whether a person of average disposition under the same circumstances "would . . . have *reacted in the same manner* from passion, rather than from judgment" (italics added). She asserts the prosecutor again misstated the law by arguing that the jury had to decide whether "a person of average disposition [*would*] *kill*" (italics added) under the same circumstances and that the standard to be applied was "how a person of average disposition *would react*." (Italics added.)

35

Citing *Beltran*, *supra*, 56 Cal.4th 935, the Attorney General acknowledges that, "[t]o the extent that the prosecutor focused on the act (to kill), rather than the reaction (with reason and judgment obscured), *Beltran* clarified that the prosecutor made a mistake in her interpretation of the law."

Jennifer and the Attorney General agree, correctly, that the prosecutor's remarks to the jury misstated the applicable law regarding the standard to be applied in deciding whether provocation is legally sufficient to constitute heat of passion and reduce a murder to voluntary manslaughter. In *Beltran*, the California Supreme Court recently held that the proper standard to be applied in deciding whether provocation is legally sufficient to constitute heat of passion[6] is not whether an ordinary person of average disposition—at the time of the killing—would *kill* under the same circumstances, but whether an ordinary person of average disposition under those circumstances would act rashly and without due deliberation or reflection and from passion rather than judgment. (*Beltran*, *supra*, 56 Cal.4th at p. 942, citing *People v. Barton* (1995) 12 Cal.4th 186.) The *Beltran* court explained its holding:

> "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to kill focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection. To satisfy [the applicable standard], the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an

---

6     The *Beltran* court defined "heat of passion" as "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran*, *supra*, 56 Cal.4th at p. 942.)

extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*Beltran*, *supra*, 56 Cal.4th at p. 949, italics omitted.)

*Beltran* also held that the proper standard is set forth in CALCRIM No. 570, which states: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, *would have reacted from passion rather than from judgment*." (*Beltran*, *supra*, 56 Cal.4th at p. 954, fn. 14, italics added.)

Although the prosecutor made remarks to the jury (discussed, *ante*) that misstated the standard to be applied in deciding whether provocation is legally sufficient to constitute heat of passion, we conclude reversal of Jennifer's conviction of second degree murder is not required because she has not shown, and cannot demonstrate, "'a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1202-1203.) The court instructed the jury with CALCRIM No. 570, which sets forth the proper standard. (*Beltran*, *supra*, 56 Cal.4th at p. 954, fn. 14.) The court also instructed the jury under CALCRIM No. 200 [2008 rev.] that it would "now instruct . . . on the law that applies to this case," that each juror "has a copy of [the] instructions to use in the jury room," that the jury "must follow the law as I explain it to you," and that "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

On appeal, we presume the jurors understood and followed the trial court's instructions. (*People v. Hinton* (2006) 37 Cal.4th 839, 871.) Thus, we presume the jury in this case understood and followed the version of CALCRIM No. 570 given by the court. Accordingly, because we presume the jury followed the court's instructions and nothing in the record shows otherwise, we conclude the jury ignored the prosecutor's misstatements during closing argument, followed the court's instructions, and applied the proper standard set forth in CALCRIM No. 570 in deciding whether any provocation by Dr. Trayers was legally sufficient to constitute heat of passion that would reduce Jennifer's killing of Dr. Trayers from murder to voluntary manslaughter.

## DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.

38